# Exhibit B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--o0o--

NEUROCENTRIA, INC., a
California corporation, and
THREOTECH, LLC, a Nevada
limited liability company,

Plaintiffs,

Vs.          Case No. CV-25-cv-05871-FLA-JPR

MANDO INTERNATIONAL, LLC d/b/a
KAPPY NUTRITION, a Texas limited
liability company,

Defendant.
_____/

--o0o--

WEDNESDAY, MARCH 18, 2026

--o0o--

VIDEOTAPED DEPOSITION

OF

SARRITA ADAMS, Ph.D.

--o0o--

Reported By:  CAROL S. NYGARD
              California CSR No. 4018
              Nevada CCR 915

Page 1

APPEARANCES:

For the Plaintiffs:
BARNES & THORNBURG, LLP
BY:  JOHN W. COX, Ph.D.
3340 Peachtree Road N.D.
Suite 2900
Atlanta, Georgia  30326
404.846.1693
john.cox@bbtlaw.com
SCHULMAN BHATTACHARYA, LLC
(Via Video Conference)
BY:  JEFFREY S. GAVENMAN, ESQ.
6116 Executive Boulevard
Suite 425
North Bethesda, Maryland  20852
240.356.8550
egavenman@schulmanbh.com

For the Defendant MANDO INTERNATIONAL, LLC:
LEGALFORCE RAPC WORLDWIDE, P.C.
BY:  RAJ V. ABHYANKER, ESQ.
1580 W. El Camino Real
Suite 10
Mountain View California  94040
650.965.8731
raj@legalforcelaw.com

Videogapher:

CAMERON TUTTLE

Also Present Via Video Conference:
ARMANDO ALFARO
JASON WEINGER

Page  2

INDEX

EXAMINATION BY COUNSEL

PAGE NO.

Examination by Mr. Abhyanker                 8

Examination by Mr. Cox                      79

Further Examination by mr. Abhyanker    172

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

                              EXHIBITS

    Exhibit No.              Description              Page No.

    Exhibit Number 7    Declaration of Sara Adams,
                        Ph.D.                           25

    Exhibit Number 8    Plaintiffs' Amended Notice
                        of Deposition of Sara
                        Adams, Ph.D.                    79

    Exhibit Number 9    Declaration of Sara Adams,
                        Ph.D.                          102

    Exhibit Number 10   Independent Scientific
                        Expert Engagement Agreement   115

    Exhibit Number 11   Declaration of [EXPERT NAME]   126

    Exhibit Number 12   Joint Claim Construction
                        Statement Pursuant to
                        Section 3(c) of the Court's
                        Patent Standing Order
                        (DKT.33)                       131

    Exhibit Number 13   Plaintiffs' Opening Claim
                        Construction Brief             142

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

NEUROCENTRIA, INC., a

California corporation, and

THREOTECH, LLC, a Nevada

limited liability company,

                    Plaintiffs,

           Vs.         Case No. CV-25-cv-05871-FLA-JPR

MANDO INTERNATIONAL, LLC d/b/a

KAPPY NUTRITION, a Texas limited

liability company,

                    Defendant.

_____/

--oOo--

        BE IT REMEMBERED, that on Wednesday, March 18, 2026, at the hour of 9:31 a.m. thereof at PatentVC Trademarkia, 3000 Sand Hill Road, Suite 245, Menlo Park, California before me, Carol S. Nygard, a Certified Shorthand Reporter of the State of California, there personally appeared,

                SARRITA ADAMS, Ph.D.,

called as a witness by the Plaintiffs and Defendants, who, being by me duly sworn, was thereupon examined and interrogated as hereinafter set forth:         09:31

        VIDEOGRAPHER:  Good morning.         09:31

        We are going on the record.         09:31

Page 5

A.    Yes, correct.                                    09:35

Q.    Okay.  And your --                               09:35

Describe --                                            09:36

So you pursued a Ph.D. at University of                09:36

Cambridge in biochemistry; correct?                    09:36

A.    Correct.                                         09:36

MR. COX:  Objection to form.                           09:36

BY MR. ABHYANKER:                                      09:36

Q.    And you passed the Ph.D., the Ph.D. viva         09:36

examination, at Cambridge in 2015; --                  09:36

A.    Correct.                                         09:36

Q.    -- is that correct?                              09:36

And following that in viva (sic.) you were             09:36

required only to complete minor corrections; correct?  09:36

A.    I believe that they were --                      09:36

MR. COX:   Objection to form.                          09:36

THE WITNESS:   -- actually -- they were stated         09:36

as "major corrections," and that they required rewriting 09:36

the first chapter.                                     09:36

BY MR. ABHYANKER:                                      09:36

Q.    Okay.  And, in fact, you completed those         09:36

corrections; correct?                                  09:36

A.    I did complete those.                            09:36

THE REPORTER:  Wait.                                   09:36

THE WITNESS:  Sorry.                                   09:36

Page 10

THE REPORTER:  You --                                      09:36

I need a little bit more --                                 09:36

THE WITNESS:  I need to pause, yeah.                        09:36

BY MR. ABHYANKER:                                           09:36

Q.    And you did complete those corrections;              09:36
correct?                                                    09:36

A.    Yes, I did.                                           09:36

Q.    And that was around 2017?                            09:36

A.    Yes.                                                  09:36

Q.    And those -- corrections were ultimately             09:36
acknowledged and approved by -- they were approved by       09:36
examiners at the time; right?                               09:36

MR. COX:  Objection to form.                                09:36

THE WITNESS:  Yes, as -- as -- what I was                   09:36
aware.                                                      09:36

So in terms of when --                                      09:36

When -- when you do a viva at Cambridge, there              09:36
are three outcomes.  You can pass, that's it, you can       09:36
pass with corrections, and that can be major or minor,      09:36
or you fail, and there is no way if you fail to get back    09:37
from it.                                                    09:37

And so what they then do is they give you the               09:37
scope that you need to complete like what areas you         09:37
need, and to --                                             09:37

So then you follow that scope, and then you                 09:37

Page 11

resubmit with the scope -- with it, and that's it.    09:37

And so I met all the criteria in that scope.    09:37

BY MR. ABHYANKER:    09:37

Q.    All right.   So academically your thesis work    09:37
satisfied Cambridge Ph.D. requirements?    09:37

A.    Absolutely.    09:37

MR. COX:   Objection to form.    09:37

BY MR. ABHYANKER:    09:37

Q.    And, in fact, the University of Cambridge    09:37
formally acknowledged that correction from 2017 in April    09:37
2025; correct?    09:37

A.    Yes, yes.    09:37

Q.    And that approval means that they approved    09:37
your Ph.D. at that time?    09:37

A.    Absolutely.    09:37

The Degree Committee, which is the granting    09:37
authority within the university of Cambridge.    09:37

Q.    Yeah.    09:37

And the approval means you completed all    09:37
academic and examination requirements for the Ph.D.;    09:37
correct?    09:37

A.    Absolutely.    09:37

MR. COX:   Objection to form.    09:37

BY MR. ABHYANKER:    09:37

Q.    And the only thing that's left is a formal    09:37

Page 12

kind of degree ceremony?                                    09:37

MR. COX:  Objection to form and foundation.                 09:37

THE WITNESS:  Correct.  So -- of course, Cambridge doesn't allow virtual degree ceremonies, and because of my immigration status as a permanent resident I had lost my green card.

It has taken many, many months to get the renewal, and so it's just been, you know, something that's sort of pending.

BY MR. ABHYANKER:

Q.   But that's just an --

That process is administrative and ceremonial only; correct?

A.   Absolutely.

MR. COX:  Objection to form.

THE WITNESS:  It's very common.

You'll see at Cambridge -- see somebody who's literally passed their viva --

MR. ABHYANKER:  Uh-huh.

THE WITNESS:  -- and they are now referred to as "Doctor."

BY MR. ABHYANKER:

Q.   Right.

And so the timing to confer the roll does not change the university's determination that you satisfied

Page 13

the Ph.D. requirements; correct?                           09:38

A.      That would be --                                   09:38

MR. COX:   Objection to form.                              09:38

THE WITNESS:   -- the correct assumption to                09:38
make.                                                      09:38

BY MR. ABHYANKER:                                          09:38

Q.      And it doesn't affect anything about your          09:38
scientific training or expertise; correct?                 09:38

A.      That's absolutely correct.                         09:38

Of course, one can just note my publications               09:38
and they can also review themselves the published          09:38
thesis.                                                    09:38

They can also review the published thesis has              09:38
a submission date of May 2014, which demonstrates my       09:38
research was completed over a decade ago now.              09:39

Q.      Okay.   Great.                                     09:39

And so you're the founder of AgnoSci; correct?            09:39

A.      Yes, correct.                                      09:39

Q.      Please describe what AgnoSci does.                09:39

A.      So what we do is we are developing diagnostic      09:39
tests, so -- and this is using biochemical processes,      09:39
and then we are overlaying those, the detection element,   09:39
with artificial intelligence, and so what is very          09:39
important when you're identifying analytes in blood, for   09:39
example, is that you have to have a high level of          09:39

Page 14

metal-ligand, and understanding complex biochemical interactions, is relevant to magnesium threonate in the claim construction of that.

MR. COX:  Objection to form, outside the scope.

THE WITNESS:  So the compound that is -- that I was asked to review and evaluate, magnesium threonate, is what we term as a metal-ligand complex.

So in biology, if you were to have a periodic table, there were two ends of it, and on one end you have your alkaline metals, and so, for example, in that you have calcium, magnesium, barium, lithium and so on.

Now, these ions are donors of electrons, is what we say.  They can give up electrons, and that means then, if a -- if an atom can give up electrons, it can form ionic bonds with other larger compounds, and, you know, and they can also find quite complex lattices that oftentimes, because ionic bonds are not as strong as covalent bonds, it is harder to actually visualize or purify out of normal bodily fluids or tissues.

BY MR. ABHYANKER:

Q.    Right.

And so this particular deposition we're trying to understand what an ordinary person skilled in the art would understand "magnesium threonate" to mean.

Page 18

So there is a transporter that takes up glucose.  There's a transporter that was --

You know, for example, COVID got into our cells because it bound to a receptor that went in.

So in this case what is being described there is that -- and therein research demonstrates this, that you can take potassium threonate, you can also take sodium threonate.  That will dissociate, the sodium ions will be taken up by sodium transporters.  The threonate will be taken up via the monocarboxylate transporters, the MCT family.

And they are done independently, and then essentially that L-threonate seems from their own research to increase the uptake of magnesium by the cell such that they can form this magnesium L-threonate complex.

BY MR. ABHYANKER:

Q.    So --

And I just wanted to make sure we went back to person of ordinary skill in the art.

You consider yourself a person of that skill; right?

A.    Yes.

MR. COX:  Objection to form, outside the scope.

Page 64

you about this morning?                                    12:25

    A.    Yes.                                             12:25

          Now, those -- those are the papers that were     12:25
relevant to this.                                          12:25

          Of course, in the process of any literature      12:25
review you read things that are not necessarily relevant   12:25
to you, so there were, of course, an excess to that.       12:25

    Q.    Were you given any legal standards by which to    12:25
approach your consideration of the information that you     12:25
were asked to review?                                      12:25

    A.    Can you give me a definition of "legal           12:25
standard"?                                                 12:25

    Q.    Were you asked to consider the validity of any    12:25
patent claims?                                             12:26

    A.    No.                                              12:26

    Q.    Were you asked to consider the infringement of    12:26
any patent claims?                                         12:26

    A.    Definitely not infringement.                     12:26

    Q.    Okay.  Do you remember when you first reviewed    12:26
the 061 Patent, which is that exhibit in front of me?      12:26

    A.    Do I remember when I first?                       12:26

    Q.    Yeah.                                             12:26

    A.    It was the first document that I reviewed         12:26
before I even looked at the literature, because            12:26
oftentimes in patents they put their own citations in      12:26

Page 85

What I understand --    12:29

Again, you know, I'm a scientist, so I look --    12:29
I frame everything from that perspective.    12:29

What I understand is this seems to be a    12:29
formulation element.  That's my understanding.    12:29

And so --    12:29

And, you know, based on --    12:29

I should have clarified earlier on that prior    12:29
to starting AgnoSci I worked as a consultant for 10    12:29
years in the biotech space.    12:30

You know, I've done lots of work, you know,    12:30
assisting -- assisting in patent applications, you know,    12:30
doing sort of the scientific background and -- and    12:30
writing these sorts of things.    12:30

So, when I look at them, I immediately    12:30
translate it into my scientific understanding, and so,    12:30
yeah, I -- I understand there's a formulation dispute or    12:30
issue that seems to have been brought up.    12:30

Q.    Have you had any formal patent law training?    12:30

A.    No.    12:30

I mean, I have worked on a lot of patents,    12:30
and, again, as a scientist it's not really -- the legal    12:30
part isn't for me.    12:30

You know, the lawyers have always told me    12:30
exactly, you know, the specifi -- how to be a bit more    12:30

Veritext Legal Solutions

866-299-5127          calendar-ca@veritext.com          www.veritext.com

scientific opinion on the matters of -- being -- that    12:55

we're discussing right now.    12:55

Q.    Okay.  And on page 1 I want to point you to    12:55

the second paragraph.    12:55

Oh, sorry.  On page 2.    12:55

So second page, second paragraph.  It's above    12:55

the 4 bullet points.    12:55

It says "You will provide an informed,    12:55

objective opinion on topics including but not limited    12:55

to:"  and then there's four bullet points; is that --    12:55

A.    Yes.    12:55

Q.    -- correct?    12:55

A.    Yes, yeah.    12:55

Q.    Okay.  On page 3 --    12:55

A.    Uh-huh.    12:55

Q.    -- in the middle of the page above that single    12:55

-- or excuse me -- under that single bullet point --    12:55

A.    Uh-huh.    12:55

Q.    -- it says, quote, "Your work will focus on    12:55

scientific and technical opinions relevant to validity    12:56

or invalidity --"    12:56

A.    Uh-huh.    12:56

Q.    "-- including," open parens, "as applicable    12:56

and supported by the record," closed parens, "lack of    12:56

written description, lack of enablement, prior art,"    12:56

Page 116

open parens, "including publications more than 20 years

old," closed parens, "and issues relating to naturally

occurring biochemical pathways, and then naturally

occurring nature of magnesium L-threonate," closed

quote.

Do you see where I read that from?

A.    Yes, uh-huh.

Q.    Okay.  So is this asking you to opine on

validity and invalidity --

MR. ABHYANKER:  Objection.

BY MR. COX:

Q.    -- of the 016 patent?

MR. ABHYANKER:  Objection.  This is hearsay

about what --

It's asking us to -- the client who wrote this

to opine on it.  It just says it's relevant to it.  It

doesn't say she's asking to be doing anything here.

THE WITNESS:  Oh.  I'm an independent person,

so, you know, to me language like "your work will focus

on," I mean, that doesn't mean a huge amount to me.

I was going to look at it, and I look at

everything as a scientist, which means that you're

supposed to be objective.

So we're in the past, and certainly in this

case, too, the client makes a request for something and

Page 117

A.    Uh-huh.    01:02

Q.    -- opinion 5, "Structure function claims are not proprietary."    01:02

Is that --    01:02

Is it fair to say that your answer for opinion 4, the commercial claims would apply equally to opinion 5, the structure functions?    01:02

A.    Absolutely.  Those are basically the commercial claims --    01:02

Q.    Okay.    01:02

A.    -- that I'm referring to.    01:02

Q.    Let's go back to the letter with the Kappa logo at the top.    01:02

Do you know if there's anything in this letter about the construction of terms from the numbered paragraph claims in the 061 Patent?    01:02 01:03

A.    Okay.  So you mean the end -- the end --    01:03

Q.    Yeah, the last paragraphs in the patent.    01:03

If you remember, they were numbered.  We looked at Claim 1.    01:03

Is there anything in this letter about construing the terms of those claims?    01:03

A.    Not directly construing them, not -- not me personally.    01:03

Q.    Okay.    01:03

Page 123

A.    You know, so I took it as I provide the sort    01:03
of scientific understanding and insight, and then it's    01:03
essentially my experience in the past is on the lawyer    01:03
to identify that which is relevant to their case.    01:03

Q.    On page 4 of the letter again, --    01:03

A.    Uh-huh.    01:03

Q.    -- there's a section that says "Timing and    01:03
Deliverables."    01:03

Do you see that?    01:03

A.    Yes.    01:03

Q.    And the letter was signed by you on the 10th    01:03
of January, and this paragraph says that you're expected    01:03
to complete an initial expert Declaration no longer than    01:03
January 18th; correct?    01:03

A.    Yes, correct.    01:03

Q.    In your Declaration -- I can read it to you,    01:04
but you're also welcome to look at it.    01:04

A.    Uh-huh.    01:04

Q.    Somewhere that says that you are compensated    01:04
at your normal consulting rate.    01:04

A.    Yes.    01:04

Q.    And this letter refers to a hundred dollars --    01:04

A.    Yes.    01:04

Q.    -- an hour.    01:04

A.    Yes.    01:04

Page 124

Yeah.  It should be --    01:12

A.    Oh, I see.  Ha-ha.  That's funny.    01:12

Q.    -- 14.    01:12

Yep.  In the box.    01:12

A.    Right, yeah.    01:12

Q.    In the -- in the box, in the table.    01:12

A.    Yes, uh-huh.  This is me, yep.    01:12

Q.    It has "witness," and it has "subject matter"    01:12
for you, "pharmaceutical formulations and dosage forms;"    01:12
correct?    01:12

A.    Uh-huh.    01:12

Q.    And do you consider yourself an expert in the    01:12
pharmaceutical formulations?    01:12

A.    I would say based on spending 10 years doing    01:12
drug discovery and drug discovery development, yeah, I    01:12
mean, that's essentially -- that's what I say is the --    01:12
the mechanism faction work.    01:12

So what is it that --    01:12

What compound --    01:12

What's the specificity of the compound, and    01:12
what does it bind, and how does it get to where it's    01:13
going to, and that type of thing, so yes.    01:13

Q.    Do you --    01:13

A.    Sorry.    01:13

Q.    Do you also consider yourself an expert in    01:13

Page 133

there?    01:21

A.    I'm just saying, what are "their claim terms."    01:21

Okay.  I see.    01:21

So I'm just trying to determine.  One second.    01:21

I'm just going to stop talking if you don't    01:21

mind.    01:21

Q.    Sure.    01:21

A.    Okay.  I see that.    01:21

Okay.  And then it says --    01:21

Okay.  Yeah.    01:21

So --    01:21

I mean, I have to say this seems to be a    01:21

little bit -- beyond my bandwidth.    01:21

It's such legalese, I'm trying to -- looking    01:21

at the words and just keep seeing the same thing.    01:22

I kind of --    01:22

I feel like I get it in -- in some way, but --    01:22

but it doesn't really mean anything to me    01:22

scientifically, and I don't have an opinion on it.    01:22

That's not what I was doing.    01:22

Q.    Do you remember looking at another document    01:22

with a caption that was called "Plaintiffs' Opening    01:22

Claim Construction Brief"?    01:22

A.    Oh, I believe so at some point, yes.    01:22

MR. COX:  Why don't I hand that to you.    01:22

Page 141

Sorry. 01:47

Most of my work now is primarily as a founder, but I still have biotech clients. 01:47

But essentially one -- once I had submitted, my thesis and -- 01:47

Well, sorry. 01:47

I had the viva, which I think was in January 2015, and so that was like the first -- that was the official submission, I think, was in 2014, and then it takes forever for them to get reviewers in. 01:47

So then it was literally like six months before I even had the viva. 01:47

So, anyway -- 01:47

And so at that point I was still -- I think I was still doing a little bit of like research work, and then I -- like I got a first contract that was doing protocol design. 01:47

So it was designing -- oh, hello. 01:47

The dog moved. 01:47

MR. COX:  Behind you.  Behind you. 01:48

That's a first.  Why don't we go back. 01:48

BY MR. COX: 01:48

Q.   So your -- your first role as a consultant -- 01:48

A.   Yes. 01:48

Q.   -- was 2015? 01:48

Page 152

Who was your advisor on your Ph.D. work?    01:50

A.    That was Evan -- Evan --    01:50

Gosh.  Why can't I remember his last name?    01:51

I'm drawing a blank.    01:51

Girard, is that his name?    01:51

Girard.    01:51

Girard.  There you go.    01:51

And he was --    01:51

He's now left Cambridge, so he's no longer at    01:51
Cambridge.    01:51

BY MR. COX:    01:51

Q.    Is he still a professor somewhere?    01:51

A.    I don't know.    01:51

He came from UCSF, so I think I was one of his    01:51
first students.    01:51

Q.    And your C.V. refers the Ph.D. in biochemistry    01:51
from the University of Cambridge from 2010 to 2015;    01:51
correct?    01:51

A.    That's correct.  That's the period of which I    01:51
did all of my research.    01:51

Q.    Okay.    01:51

A.    And then also because -- the cut-off is once    01:51
you've submitted the viva; right?    01:51

So that's where they're going to say pass or    01:51
fail.    01:51

Page 156

Beyond that, I wasn't doing any for my Ph.D.    01:51

Q.    And so you had Professor Girard at    01:51
Cambridge --    01:51

A.    Yes.    01:51

Q.    -- as an advisor.    01:51

Did you also have an -- an advisor at U.C.    01:51
Davis?    01:51

A.    Yes, I did.    01:52

Q.    Who was that?    01:52

A.    That was Jeanne LaSalle.    01:52

Q.    Can you spell the last?    01:52

A.    L-a, and then S-a-l-l-e.    01:52

Q.    Okay.  How many papers have you published with    01:52
Professor Girard?    01:52

A.    So none with him, because, if you think about    01:52
it, my research was actually with Jeanne LaSalle; right?    01:52

Because, of course, I was working with her    01:52
research group.  The --    01:52

Originally, when I started my Ph.D. at    01:52
Cambridge the supervisor was a supervisor named Rick    01:52
Kaladisky (ph.), and he had a funding issue.    01:52

Because, of course, it was around that time of    01:52
the financial crisis, and so then they were trying to    01:52
sort of spread out students so that they could deal with    01:52
the funding, and I think I was probably, you know, a    01:52

Page 157

Professor La Salle was more recent than your work with    01:53

Professor Girard?    01:53

A.    Yes, because with him -- with -- with    01:53

Professor -- with -- with John, the way it works really    01:53

was that I had established --    01:53

So he approved my project, my Ph.D. project,    01:53

and so it was on whether I was going to do it in Britain    01:54

or whether I was going to do it in the way that I did    01:54

it.    01:54

And so, of course, at that point then I came    01:54

out here, and so the work, even though it was still    01:54

overseen by him, it was directly with the Ph.D. and    01:54

post-docs in Professor LaSalle's lab.    01:54

Q.    Okay.  I'll represent that counsel for    01:54

Defendant provided us with a list of publications out of    01:54

something called "Orchid."    01:54

A.    Yes, yeah.    01:54

Q.    What is "Orchid"?    01:54

A.    So "Orchid I.D." is what your institution, so    01:54

your --    01:54

The only institution that gives you your    01:54

degree will then populate, so they connect.    01:54

So they can relax --    01:54

Or at least Cambridge, anyway.    01:54

So Cambridge anyway.    01:54

Page 159

So Cambridge collects all of your publications, and then it then uploads them -- and then that way --

And so then you can see -- or something like sympathic evidence or something like that, and that's who put it there, and that's so then you can see that came from Cambridge, and it wasn't just me claiming this is my paper, if that makes sense.

Q.    Okay.  You testified this morning in response to a question from Mr. Abhyanker that you submitted corrections to your Ph.D. in 2017?

A.    Yes, correct.

Q.    When in 2017?

A.    So I believe it was in about January/February, 2017.

At that time I was going through a pretty horrible divorce, and it was really sort of like, you know, fielding all of this sort crazy litigation and trying to -- and moving at the same time.

And so realistically what I did was I submitted it with the cover sheet, and I was like they'll -- they'll do the rest, which is kind of typically how it worked.

I mean, if you compare it to the system out here, it seems much more clear cut, and so it was only

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

then, literally years later, that I discovered that it    01:55

hadn't -- hadn't been properly finalized.    01:55

Q.    Okay.    And and when you say "properly    01:55

finalized," are you referring to what you testified    01:55

about this morning and receiving an acknowledgement from    01:55

Cambridge in April 2025?    01:55

A.    Yes.    01:55

So I'll tell you what happened is there were    01:55

-- there were various accusations made about me that I    01:55

was, you know, fortunately representing my education.    01:56

I then wrote to the University of Cambridge    01:56

and stated to them that I was -- that this was    01:56

concerning to me and could they help to identify what    01:56

the issues were.    01:56

And then that -- started this process with the    01:56

Degree Committee, because what happens with the    01:56

corrections is the Degree Committee has to sign them    01:56

off.    01:56

In my case what happened was I sent the    01:56

corrections back to my advisor, who was Brian Hendrick,    01:56

and he did not then send them back to the Degree    01:56

Committee.    01:56

Q.    What --    01:56

What is --    01:56

What different roles did Girard Evan and Brian    01:56

Page 161

question "You're seeking to complete your Ph.D. --"    01:57

A.    Uh-huh.    01:57

Q.    "-- and finishing up your thesis," end quote;    01:57
correct?    01:57

A.    Yes.    01:57

Q.    And you had already submitted --    01:57

A.    Yes, I had.    01:57

Q.    -- your corrections in January or February;    01:57
correct?    01:57

A.    Yes.    01:57

Q.    And then your attorney asked you, quote, "When    01:57
do you expect to complete your Ph.D.?"    01:58

A.    Uh-huh.    01:58

Q.    and you answered "I don't know.  As soon as I    01:58
can;" correct?    01:58

A.    Yes.    01:58

Q.    So is it fair to say that the acknowledgement    01:58
that you received in April 2025 would indicate that you    01:58
have now completed your Ph.D.?    01:58

A.    I would say so.    01:58

Q.    Okay.  You were also asked by your attorney on    01:58
that November 7th trial testimony, quote, "And what work    01:58
do you have to do to complete your Ph.D. dissertation?",    01:58
end quote, and you answered, quote, "I received major    01:58
corrections.  I was told to rewrite the entirety of my    01:58

Page 163

thesis, to conduct new analysis, data analysis, from

gene data I received, and restructure the thesis as well

as rewrite all the chapters," end quote; right?

A.    Yes.

Q.    And you did that, submitted that in January or February of 2017?

A.    Yes.

I do want to just make a point that my lawyer -- for my divorce case stated to me that, if it was the opinion of the Court that I completed my Ph.D., then my spousal support would be lower.

Q.    So let's go back to your Declaration real quick, which is -- you can look at 95-2, though --

A.    Uh-huh.

Q.    -- 93-2, 2 or 3, is the one that actually had the attachments to it.

A.    Uh-huh.

Q.    Paragraph 2 of your Declaration says Exhibit A is a true and correct copy of your curriculum vitae; correct?

A.    Uh-huh.

Q.    Correct?

And you stand by that statement; right?

A.    Yes.

Q.    Okay.  So the -- I have some more questions

Page 164

and the deposition resumed at 2:23 p.m.)                    02:23

VIDEOGRAPHER:  We're back on the record.                    02:23

The time is 2:23 p.m.                                       02:23

FURTHER EXAMINATION                                         02:23

BY MR. ABHYANKER:                                           02:23

Q.    Okay.  Dr. Adams, you're not offering any            02:23
legal opinions about anything in this right now; right?    02:23

A.    No, absolutely not.                                   02:23

Q.    You're not a lawyer; --                               02:23

A.    No.                                                   02:23

Q.    -- right?                                             02:23

And your role here is to explain scientific                02:23
principles; correct?                                        02:23

MR. COX:  Objection to form.                                02:23

BY MR. ABHYANKER:                                           02:23

Q.    As opposed to interpret patent claims?               02:23

MR. COX:  Objection to form.                                02:23

THE WITNESS:  Yes, that would be the case.                 02:23

BY MR. ABHYANKER:                                           02:23

Q.    And the scientific conclusions in your               02:23
Declaration reflect your own independent opinions;         02:23
correct?                                                    02:23

MR. COX:  Objection to form, leading.                       02:23

THE WITNESS:  Yes.                                          02:24

They --                                                     02:24

Page 172

divorce was even filed, so when I finished my Ph.D. research in 2015, and my divorce was filed in September 2016.

BY MR. ABHYANKER:

Q.    There's nothing here today that prevents you from giving me your best testimony?

A.    Absolutely not.

I mean, I would like to think in the 21st Century, women, scientific women, female scientists, wouldn't still be held to sort of old fashion standards about whether, you know, we're allowed to get divorced and whether that should be, you know, dragged through.

It was an incredibly traumatic experience being in a foreign country and being subject to a legal system that seemed to be not really interested in my rights.

And so to have it been dragged up repeatedly like this, and it has been, I do find pretty unpleasant, and I feel like it's actually quite unprofessional.

MR. ABHYANKER:  Yeah.

And I can sympathize with that.

I don't have any further questions.

Thank you.

THE WITNESS:  Thank you.

VIDEOGRAPHER:  Okay.  Can I get orders for

Page 179

I, CAROL S. NYGARD, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any witness or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name:

Dated:

CAROL S. NYGARD CSR #4018

Page 181