# Exhibit E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--o0o--

NEUROCENTRIA, INC., a
California corporation, and
THREOTECH, LLC, a Nevada
limited liability company,

Plaintiffs,

Vs.          Case No. CV-25-cv-05871-FLA-JPR

MANDO INTERNATIONAL, LLC d/b/a
KAPPY NUTRITION, a Texas limited
liability company,

Defendant.
_____/

--o0o--

WEDNESDAY, MARCH 18, 2026

--o0o--

VIDEOTAPED DEPOSITION
OF
SARRITA ADAMS, Ph.D.

--o0o--

Reported By:  CAROL S. NYGARD
California CSR No. 4018
Nevada CCR 915

Page 1

APPEARANCES:

For the Plaintiffs:
BARNES & THORNBURG, LLP
BY:  JOHN W. COX, Ph.D.
3340 Peachtree Road N.D.
Suite 2900
Atlanta, Georgia  30326
404.846.1693
john.cox@bbtlaw.com
SCHULMAN BHATTACHARYA, LLC
(Via Video Conference)
BY:  JEFFREY S. GAVENMAN, ESQ.
6116 Executive Boulevard
Suite 425
North Bethesda, Maryland  20852
240.356.8550
egavenman@schulmanbh.com

For the Defendant MANDO INTERNATIONAL, LLC:
LEGALFORCE RAPC WORLDWIDE, P.C.
BY:  RAJ V. ABHYANKER, ESQ.
1580 W. El Camino Real
Suite 10
Mountain View California  94040
650.965.8731
raj@legalforcelaw.com

Videogapher:

CAMERON TUTTLE

Also Present Via Video Conference:
ARMANDO ALFARO
JASON WEINGER

Page 2

```
                          INDEX

                 EXAMINATION BY COUNSEL

                                              PAGE NO.

        Examination by Mr. Abhyanker              8

        Examination by Mr. Cox                   79

        Further Examination by mr. Abhyanker    172
```

Page 3

```
                        EXHIBITS
Exhibit No.              Description              Page No.
Exhibit Number 7   Declaration of Sara Adams,
                   Ph.D.                            25

Exhibit Number 8   Plaintiffs' Amended Notice
                   of Deposition of Sara
                   Adams, Ph.D.                     79

Exhibit Number 9   Declaration of Sara Adams,
                   Ph.D.                           102
Exhibit Number 10  Independent Scientific
                   Expert Engagement Agreement    115

Exhibit Number 11  Declaration of [EXPERT NAME]   126

Exhibit Number 12  Joint Claim Construction
                   Statement Pursuant to
                   Section 3(c) of the Court's
                   Patent Standing Order
                   (DKT.33)                        131

Exhibit Number 13  Plaintiffs' Opening Claim
                   Construction Brief              142
```

Page 4

                    UNITED STATES DISTRICT COURT

                  CENTRAL DISTRICT OF CALIFORNIA

                            --o0o--

NEUROCENTRIA, INC., a

California corporation, and

THREOTECH, LLC, a Nevada

limited liability company,


                    Plaintiffs,


            Vs.        Case No. CV-25-cv-05871-FLA-JPR


MANDO INTERNATIONAL, LLC d/b/a

KAPPY NUTRITION, a Texas limited

liability company,


                    Defendant.
_____/


                            --o0o--


        BE IT REMEMBERED, that on Wednesday, March 18,
2026, at the hour of 9:31 a.m. thereof at PatentVC
Trademarkia, 3000 Sand Hill Road, Suite 245, Menlo Park,
California before me, Carol S. Nygard, a Certified
Shorthand Reporter of the State of California, there
personally appeared,
                    SARRITA ADAMS, Ph.D.,
called as a witness by the Plaintiffs and Defendants,
who, being by me duly sworn, was thereupon examined and
interrogated as hereinafter set forth:                    09:31
            VIDEOGRAPHER:  Good morning.                   09:31
            We are going on the record.                    09:31

                                                      Page 5

A.    Yes, correct.    09:35

Q.    Okay.  And your --    09:35

Describe --    09:36

So you pursued a Ph.D. at University of Cambridge in biochemistry; correct?    09:36

A.    Correct.    09:36

MR. COX:  Objection to form.    09:36

BY MR. ABHYANKER:    09:36

Q.    And you passed the Ph.D., the Ph.D. viva examination, at Cambridge in 2015; --    09:36

A.    Correct.    09:36

Q.    -- is that correct?    09:36

And following that in viva (sic.) you were required only to complete minor corrections; correct?    09:36

A.    I believe that they were --    09:36

MR. COX:  Objection to form.    09:36

THE WITNESS:  -- actually -- they were stated as "major corrections," and that they required rewriting the first chapter.    09:36

BY MR. ABHYANKER:    09:36

Q.    Okay.  And, in fact, you completed those corrections; correct?    09:36

A.    I did complete those.    09:36

THE REPORTER:  Wait.    09:36

THE WITNESS:  Sorry.    09:36

Page 10

THE REPORTER:  You --

I need a little bit more --

THE WITNESS:  I need to pause, yeah.

BY MR. ABHYANKER:

Q.    And you did complete those corrections; correct?

A.    Yes, I did.

Q.    And that was around 2017?

A.    Yes.

Q.    And those -- corrections were ultimately acknowledged and approved by -- they were approved by examiners at the time; right?

MR. COX:   Objection to form.

THE WITNESS:   Yes, as -- as -- what I was aware.

So in terms of when --

When -- when you do a viva at Cambridge, there are three outcomes.  You can pass, that's it, you can pass with corrections, and that can be major or minor, or you fail, and there is no way if you fail to get back from it.

And so what they then do is they give you the scope that you need to complete like what areas you need, and to --

So then you follow that scope, and then you

Page 11

resubmit with the scope -- with it, and that's it.

And so I met all the criteria in that scope.

BY MR. ABHYANKER:

Q.    All right.   So academically your thesis work satisfied Cambridge Ph.D. requirements?

A.    Absolutely.

MR. COX:   Objection to form.

BY MR. ABHYANKER:

Q.    And, in fact, the University of Cambridge formally acknowledged that correction from 2017 in April 2025; correct?

A.    Yes, yes.

Q.    And that approval means that they approved your Ph.D. at that time?

A.    Absolutely.

The Degree Committee, which is the granting authority within the university of Cambridge.

Q.    Yeah.

And the approval means you completed all academic and examination requirements for the Ph.D.; correct?

A.    Absolutely.

MR. COX:   Objection to form.

BY MR. ABHYANKER:

Q.    And the only thing that's left is a formal

Page 12

kind of degree ceremony?

MR. COX:  Objection to form and foundation.

THE WITNESS:  Correct.  So -- of course, Cambridge doesn't allow virtual degree ceremonies, and because of my immigration status as a permanent resident I had lost my green card.

It has taken many, many months to get the renewal, and so it's just been, you know, something that's sort of pending.

BY MR. ABHYANKER:

Q.   But that's just an --

That process is administrative and ceremonial only; correct?

A.   Absolutely.

MR. COX:  Objection to form.

THE WITNESS:  It's very common.

You'll see at Cambridge -- see somebody who's literally passed their viva --

MR. ABHYANKER:  Uh-huh.

THE WITNESS:  -- and they are now referred to as "Doctor."

BY MR. ABHYANKER:

Q.   Right.

And so the timing to confer the roll does not change the university's determination that you satisfied

Page 13

the Ph.D. requirements; correct?                                    09:38

A.      That would be --                                            09:38

        MR. COX:   Objection to form.                               09:38

        THE WITNESS:   -- the correct assumption to                 09:38

make.                                                               09:38

BY MR. ABHYANKER:                                                   09:38

Q.      And it doesn't affect anything about your                   09:38
scientific training or expertise; correct?                          09:38

A.      That's absolutely correct.                                  09:38

        Of course, one can just note my publications                09:38
and they can also review themselves the published                   09:38
thesis.                                                             09:38

        They can also review the published thesis has                09:38
a submission date of May 2014, which demonstrates my                09:38
research was completed over a decade ago now.                       09:39

Q.      Okay.  Great.                                               09:39

        And so you're the founder of AgnoSci; correct?              09:39

A.      Yes, correct.                                               09:39

Q.      Please describe what AgnoSci does.                          09:39

A.      So what we do is we are developing diagnostic               09:39
tests, so -- and this is using biochemical processes,               09:39
and then we are overlaying those, the detection element,            09:39
with artificial intelligence, and so what is very                   09:39
important when you're identifying analytes in blood, for            09:39
example, is that you have to have a high level of                   09:39

Page 14

metal-ligand, and understanding complex biochemical interactions, is relevant to magnesium threonate in the claim construction of that.

MR. COX:  Objection to form, outside the scope.

THE WITNESS:  So the compound that is -- that I was asked to review and evaluate, magnesium threonate, is what we term as a metal-ligand complex.

So in biology, if you were to have a periodic table, there were two ends of it, and on one end you have your alkaline metals, and so, for example, in that you have calcium, magnesium, barium, lithium and so on.

Now, these ions are donors of electrons, is what we say.  They can give up electrons, and that means then, if a -- if an atom can give up electrons, it can form ionic bonds with other larger compounds, and, you know, and they can also find quite complex lattices that oftentimes, because ionic bonds are not as strong as covalent bonds, it is harder to actually visualize or purify out of normal bodily fluids or tissues.

BY MR. ABHYANKER:

Q.    Right.

And so this particular deposition we're trying to understand what an ordinary person skilled in the art would understand "magnesium threonate" to mean.

Page 18

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

So there is a transporter that takes up glucose. There's a transporter that was --

You know, for example, COVID got into our cells because it bound to a receptor that went in.

So in this case what is being described there is that -- and therein research demonstrates this, that you can take potassium threonate, you can also take sodium threonate. That will dissociate, the sodium ions will be taken up by sodium transporters. The threonate will be taken up via the monocarboxylate transporters, the MCT family.

And they are done independently, and then essentially that L-threonate seems from their own research to increase the uptake of magnesium by the cell such that they can form this magnesium L-threonate complex.

BY MR. ABHYANKER:

Q.    So --

And I just wanted to make sure we went back to person of ordinary skill in the art.

You consider yourself a person of that skill; right?

A.    Yes.

MR. COX:   Objection to form, outside the scope.

Page 64

you about this morning?                                12:25

A.    Yes.                                             12:25

Now, those -- those are the papers that were          12:25
relevant to this.                                     12:25

Of course, in the process of any literature           12:25
review you read things that are not necessarily relevant   12:25
to you, so there were, of course, an excess to that.  12:25

Q.    Were you given any legal standards by which to  12:25
approach your consideration of the information that you   12:25
were asked to review?                                 12:25

A.    Can you give me a definition of "legal          12:25
standard"?                                            12:25

Q.    Were you asked to consider the validity of any  12:25
patent claims?                                        12:26

A.    No.                                             12:26

Q.    Were you asked to consider the infringement of  12:26
any patent claims?                                    12:26

A.    Definitely not infringement.                    12:26

Q.    Okay.  Do you remember when you first reviewed  12:26
the 061 Patent, which is that exhibit in front of me?  12:26

A.    Do I remember when I first?                      12:26

Q.    Yeah.                                            12:26

A.    It was the first document that I reviewed        12:26
before I even looked at the literature, because        12:26
oftentimes in patents they put their own citations in  12:26

Page 85

What I understand --

Again, you know, I'm a scientist, so I look -- I frame everything from that perspective.

What I understand is this seems to be a formulation element.  That's my understanding.

And so --

And, you know, based on --

I should have clarified earlier on that prior to starting AgnoSci I worked as a consultant for 10 years in the biotech space.

You know, I've done lots of work, you know, assisting -- assisting in patent applications, you know, doing sort of the scientific background and -- and writing these sorts of things.

So, when I look at them, I immediately translate it into my scientific understanding, and so, yeah, I -- I understand there's a formulation dispute or issue that seems to have been brought up.

Q.   Have you had any formal patent law training?

A.   No.

I mean, I have worked on a lot of patents, and, again, as a scientist it's not really -- the legal part isn't for me.

You know, the lawyers have always told me exactly, you know, the specifi -- how to be a bit more

Page 90

scientific opinion on the matters of -- being -- that 12:55

we're discussing right now. 12:55

Q. Okay. And on page 1 I want to point you to 12:55
the second paragraph. 12:55

Oh, sorry. On page 2. 12:55

So second page, second paragraph. It's above 12:55
the 4 bullet points. 12:55

It says "You will provide an informed, 12:55
objective opinion on topics including but not limited 12:55
to:" and then there's four bullet points; is that -- 12:55

A. Yes. 12:55

Q. -- correct? 12:55

A. Yes, yeah. 12:55

Q. Okay. On page 3 -- 12:55

A. Uh-huh. 12:55

Q. -- in the middle of the page above that single 12:55
-- or excuse me -- under that single bullet point -- 12:55

A. Uh-huh. 12:55

Q. -- it says, quote, "Your work will focus on 12:55
scientific and technical opinions relevant to validity 12:56
or invalidity --" 12:56

A. Uh-huh. 12:56

Q. "-- including," open parens, "as applicable 12:56
and supported by the record," closed parens, "lack of 12:56
written description, lack of enablement, prior art," 12:56

Page 116

open parens, "including publications more than 20 years old," closed parens, "and issues relating to naturally occurring biochemical pathways, and then naturally occurring nature of magnesium L-threonate," closed quote.

Do you see where I read that from?

A.    Yes, uh-huh.

Q.    Okay.  So is this asking you to opine on validity and invalidity --

MR. ABHYANKER:  Objection.

BY MR. COX:

Q.    -- of the 016 patent?

MR. ABHYANKER:  Objection.  This is hearsay about what --

It's asking us to -- the client who wrote this to opine on it.  It just says it's relevant to it.  It doesn't say she's asking to be doing anything here.

THE WITNESS:  Oh.  I'm an independent person, so, you know, to me language like "your work will focus on," I mean, that doesn't mean a huge amount to me.

I was going to look at it, and I look at everything as a scientist, which means that you're supposed to be objective.

So we're in the past, and certainly in this case, too, the client makes a request for something and

Page 117

A.    Uh-huh.                                          01:02

Q.    -- opinion 5, "Structure function claims are     01:02
not proprietary."                                       01:02

Is that --                                              01:02

Is it fair to say that your answer for opinion          01:02
4, the commercial claims would apply equally to opinion  01:02
5, the structure functions?                              01:02

A.    Absolutely.  Those are basically the              01:02
commercial claims --                                     01:02

Q.    Okay.                                              01:02

A.    -- that I'm referring to.                          01:02

Q.    Let's go back to the letter with the Kappa        01:02
logo at the top.                                         01:02

Do you know if there's anything in this letter          01:02
about the construction of terms from the numbered        01:02
paragraph claims in the 061 Patent?                      01:03

A.    Okay.  So you mean the end -- the end --           01:03

Q.    Yeah, the last paragraphs in the patent.          01:03

If you remember, they were numbered.  We                 01:03
looked at Claim 1.                                       01:03

Is there anything in this letter about                   01:03
construing the terms of those claims?                    01:03

A.    Not directly construing them, not -- not me       01:03
personally.                                              01:03

Q.    Okay.                                              01:03

Page 123

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

A.    You know, so I took it as I provide the sort    01:03
of scientific understanding and insight, and then it's    01:03
essentially my experience in the past is on the lawyer    01:03
to identify that which is relevant to their case.    01:03

Q.    On page 4 of the letter again, --    01:03

A.    Uh-huh.    01:03

Q.    -- there's a section that says "Timing and    01:03
Deliverables."    01:03

Do you see that?    01:03

A.    Yes.    01:03

Q.    And the letter was signed by you on the 10th    01:03
of January, and this paragraph says that you're expected    01:03
to complete an initial expert Declaration no longer than    01:03
January 18th; correct?    01:03

A.    Yes, correct.    01:03

Q.    In your Declaration -- I can read it to you,    01:04
but you're also welcome to look at it.    01:04

A.    Uh-huh.    01:04

Q.    Somewhere that says that you are compensated    01:04
at your normal consulting rate.    01:04

A.    Yes.    01:04

Q.    And this letter refers to a hundred dollars --    01:04

A.    Yes.    01:04

Q.    -- an hour.    01:04

A.    Yes.    01:04

Page 124

Yeah.  It should be --                                        01:12

A.    Oh, I see.  Ha-ha.  That's funny.                       01:12

Q.    -- 14.                                                  01:12

Yep.  In the box.                                            01:12

A.    Right, yeah.                                           01:12

Q.    In the -- in the box, in the table.                    01:12

A.    Yes, uh-huh.  This is me, yep.                         01:12

Q.    It has "witness," and it has "subject matter"          01:12
for you, "pharmaceutical formulations and dosage forms;"     01:12
correct?                                                     01:12

A.    Uh-huh.                                                 01:12

Q.    And do you consider yourself an expert in the          01:12
pharmaceutical formulations?                                 01:12

A.    I would say based on spending 10 years doing           01:12
drug discovery and drug discovery development, yeah, I       01:12
mean, that's essentially -- that's what I say is the --      01:12
the mechanism faction work.                                  01:12

So what is it that --                                        01:12

What compound --                                             01:12

What's the specificity of the compound, and                 01:12
what does it bind, and how does it get to where it's         01:13
going to, and that type of thing, so yes.                    01:13

Q.    Do you --                                              01:13

A.    Sorry.                                                  01:13

Q.    Do you also consider yourself an expert in             01:13

Page 133

there?                                                                01:21

A.    I'm just saying, what are "their claim terms."   01:21

Okay.  I see.                                            01:21

So I'm just trying to determine.  One second.           01:21

I'm just going to stop talking if you don't             01:21
mind.                                                    01:21

Q.    Sure.                                              01:21

A.    Okay.  I see that.                                 01:21

Okay.  And then it says --                               01:21

Okay.  Yeah.                                             01:21

So --                                                    01:21

I mean, I have to say this seems to be a                 01:21
little bit -- beyond my bandwidth.                       01:21

It's such legalese, I'm trying to -- looking            01:21
at the words and just keep seeing the same thing.        01:22

I kind of --                                             01:22

I feel like I get it in -- in some way, but --          01:22
but it doesn't really mean anything to me                01:22
scientifically, and I don't have an opinion on it.       01:22

That's not what I was doing.                             01:22

Q.    Do you remember looking at another document        01:22
with a caption that was called "Plaintiffs' Opening      01:22
Claim Construction Brief"?                                01:22

A.    Oh, I believe so at some point, yes.               01:22

MR. COX:  Why don't I hand that to you.                  01:22

Page 141

Sorry.                                                          01:47

Most of my work now is primarily as a founder,                 01:47
but I still have biotech clients.                              01:47

But essentially one -- once I had submitted,                   01:47
my thesis and --                                              01:47

Well, sorry.                                                   01:47

I had the viva, which I think was in January                   01:47
2015, and so that was like the first -- that was the          01:47
official submission, I think, was in 2014, and then it        01:47
takes forever for them to get reviewers in.                   01:47

So then it was literally like six months            01:47
before I even had the viva.                                   01:47

So, anyway --                                                 01:47

And so at that point I was still -- I think I       01:47
was still doing a little bit of like research work, and       01:47
then I -- like I got a first contract that was doing          01:47
protocol design.                                              01:47

So it was designing -- oh, hello.                    01:47

The dog moved.                                               01:47

MR. COX:  Behind you.  Behind you.                   01:48

That's a first.  Why don't we go back.               01:48

BY MR. COX:                                                   01:48

Q.    So your -- your first role as a consultant --   01:48

A.    Yes.                                                    01:48

Q.    -- was 2015?                                           01:48

Page 152

Who was your advisor on your Ph.D. work?    01:50

A.    That was Evan -- Evan --    01:50

Gosh.   Why can't I remember his last name?    01:51

I'm drawing a blank.    01:51

Girard, is that his name?    01:51

Girard.    01:51

Girard.   There you go.    01:51

And he was --    01:51

He's now left Cambridge, so he's no longer at    01:51
Cambridge.    01:51

BY MR. COX:    01:51

Q.    Is he still a professor somewhere?    01:51

A.    I don't know.    01:51

He came from UCSF, so I think I was one of his    01:51
first students.    01:51

Q.    And your C.V. refers the Ph.D. in biochemistry    01:51
from the University of Cambridge from 2010 to 2015;    01:51
correct?    01:51

A.    That's correct.   That's the period of which I    01:51
did all of my research.    01:51

Q.    Okay.    01:51

A.    And then also because -- the cut-off is once    01:51
you've submitted the viva; right?    01:51

So that's where they're going to say pass or    01:51
fail.    01:51

Page 156

Beyond that, I wasn't doing any for my Ph.D.    01:51

Q.    And so you had Professor Girard at    01:51
Cambridge --    01:51

A.    Yes.    01:51

Q.    -- as an advisor.    01:51

Did you also have an -- an advisor at U.C.    01:51
Davis?    01:51

A.    Yes, I did.    01:52

Q.    Who was that?    01:52

A.    That was Jeanne LaSalle.    01:52

Q.    Can you spell the last?    01:52

A.    L-a, and then S-a-l-l-e.    01:52

Q.    Okay.  How many papers have you published with    01:52
Professor Girard?    01:52

A.    So none with him, because, if you think about    01:52
it, my research was actually with Jeanne LaSalle; right?    01:52

Because, of course, I was working with her    01:52
research group.  The --    01:52

Originally, when I started my Ph.D. at    01:52
Cambridge the supervisor was a supervisor named Rick    01:52
Kaladisky (ph.), and he had a funding issue.    01:52

Because, of course, it was around that time of    01:52
the financial crisis, and so then they were trying to    01:52
sort of spread out students so that they could deal with    01:52
the funding, and I think I was probably, you know, a    01:52

Page 157

Professor La Salle was more recent than your work with Professor Girard? 01:53

A. Yes, because with him -- with -- with Professor -- with -- with John, the way it works really was that I had established -- 01:53

So he approved my project, my Ph.D. project, and so it was on whether I was going to do it in Britain or whether I was going to do it in the way that I did it. 01:54

And so, of course, at that point then I came out here, and so the work, even though it was still overseen by him, it was directly with the Ph.D. and post-docs in Professor LaSalle's lab. 01:54

Q. Okay. I'll represent that counsel for Defendant provided us with a list of publications out of something called "Orchid." 01:54

A. Yes, yeah. 01:54

Q. What is "Orchid"? 01:54

A. So "Orchid I.D." is what your institution, so your -- 01:54

The only institution that gives you your degree will then populate, so they connect. 01:54

So they can relax -- 01:54

Or at least Cambridge, anyway. 01:54

So Cambridge anyway. 01:54

Page 159

So Cambridge collects all of your publications, and then it then uploads them -- and then that way --

And so then you can see -- or something like sympathic evidence or something like that, and that's who put it there, and that's so then you can see that came from Cambridge, and it wasn't just me claiming this is my paper, if that makes sense.

Q.    Okay.  You testified this morning in response to a question from Mr. Abhyanker that you submitted corrections to your Ph.D. in 2017?

A.    Yes, correct.

Q.    When in 2017?

A.    So I believe it was in about January/February, 2017.

At that time I was going through a pretty horrible divorce, and it was really sort of like, you know, fielding all of this sort crazy litigation and trying to -- and moving at the same time.

And so realistically what I did was I submitted it with the cover sheet, and I was like they'll -- they'll do the rest, which is kind of typically how it worked.

I mean, if you compare it to the system out here, it seems much more clear cut, and so it was only

Page 160

then, literally years later, that I discovered that it 01:55

hadn't -- hadn't been properly finalized. 01:55

Q.    Okay.   And and when you say "properly 01:55

finalized," are you referring to what you testified 01:55

about this morning and receiving an acknowledgement from 01:55

Cambridge in April 2025? 01:55

A.    Yes. 01:55

So I'll tell you what happened is there were 01:55

-- there were various accusations made about me that I 01:55

was, you know, fortunately representing my education. 01:56

I then wrote to the University of Cambridge 01:56

and stated to them that I was -- that this was 01:56

concerning to me and could they help to identify what 01:56

the issues were. 01:56

And then that -- started this process with the 01:56

Degree Committee, because what happens with the 01:56

corrections is the Degree Committee has to sign them 01:56

off. 01:56

In my case what happened was I sent the 01:56

corrections back to my advisor, who was Brian Hendrick, 01:56

and he did not then send them back to the Degree 01:56

Committee. 01:56

Q.    What -- 01:56

What is -- 01:56

What different roles did Girard Evan and Brian 01:56

Page 161

question "You're seeking to complete your Ph.D. --"    01:57

A.    Uh-huh.    01:57

Q.    "-- and finishing up your thesis," end quote;    01:57
correct?    01:57

A.    Yes.    01:57

Q.    And you had already submitted --    01:57

A.    Yes, I had.    01:57

Q.    -- your corrections in January or February;    01:57
correct?    01:57

A.    Yes.    01:57

Q.    And then your attorney asked you, quote, "When    01:57
do you expect to complete your Ph.D.?"    01:58

A.    Uh-huh.    01:58

Q.    and you answered "I don't know.  As soon as I    01:58
can;" correct?    01:58

A.    Yes.    01:58

Q.    So is it fair to say that the acknowledgement    01:58
that you received in April 2025 would indicate that you    01:58
have now completed your Ph.D.?    01:58

A.    I would say so.    01:58

Q.    Okay.  You were also asked by your attorney on    01:58
that November 7th trial testimony, quote, "And what work    01:58
do you have to do to complete your Ph.D. dissertation?",    01:58
end quote, and you answered, quote, "I received major    01:58
corrections.  I was told to rewrite the entirety of my    01:58

Page 163

thesis, to conduct new analysis, data analysis, from    01:58

gene data I received, and restructure the thesis as well    01:58

as rewrite all the chapters," end quote; right?    01:59

A.    Yes.    01:59

Q.    And you did that, submitted that in January or February of 2017?    01:59

A.    Yes.    01:59

I do want to just make a point that my lawyer -- for my divorce case stated to me that, if it was the opinion of the Court that I completed my Ph.D., then my spousal support would be lower.    01:59

Q.    So let's go back to your Declaration real quick, which is -- you can look at 95-2, though --    01:59

A.    Uh-huh.    01:59

Q.    -- 93-2, 2 or 3, is the one that actually had the attachments to it.    01:59

A.    Uh-huh.    01:59

Q.    Paragraph 2 of your Declaration says Exhibit A is a true and correct copy of your curriculum vitae; correct?    01:59

A.    Uh-huh.    01:59

Q.    Correct?    01:59

And you stand by that statement; right?    01:59

A.    Yes.    01:59

Q.    Okay.  So the -- I have some more questions    01:59

Page 164

and the deposition resumed at 2:23 p.m.)    02:23

VIDEOGRAPHER:  We're back on the record.    02:23

The time is 2:23 p.m.    02:23

FURTHER EXAMINATION    02:23

BY MR. ABHYANKER:    02:23

Q.    Okay.  Dr. Adams, you're not offering any legal opinions about anything in this right now; right?    02:23

A.    No, absolutely not.    02:23

Q.    You're not a lawyer; --    02:23

A.    No.    02:23

Q.    -- right?    02:23

And your role here is to explain scientific principles; correct?    02:23

MR. COX:  Objection to form.    02:23

BY MR. ABHYANKER:    02:23

Q.    As opposed to interpret patent claims?    02:23

MR. COX:  Objection to form.    02:23

THE WITNESS:  Yes, that would be the case.    02:23

BY MR. ABHYANKER:    02:23

Q.    And the scientific conclusions in your Declaration reflect your own independent opinions; correct?    02:23

MR. COX:  Objection to form, leading.    02:23

THE WITNESS:  Yes.    02:24

They --    02:24

Page 172

divorce was even filed, so when I finished my Ph.D. research in 2015, and my divorce was filed in September 2016.

BY MR. ABHYANKER:

Q. There's nothing here today that prevents you from giving me your best testimony?

A. Absolutely not.

I mean, I would like to think in the 21st Century, women, scientific women, female scientists, wouldn't still be held to sort of old fashion standards about whether, you know, we're allowed to get divorced and whether that should be, you know, dragged through.

It was an incredibly traumatic experience being in a foreign country and being subject to a legal system that seemed to be not really interested in my rights.

And so to have it been dragged up repeatedly like this, and it has been, I do find pretty unpleasant, and I feel like it's actually quite unprofessional.

MR. ABHYANKER: Yeah.

And I can sympathize with that.

I don't have any further questions.

Thank you.

THE WITNESS: Thank you.

VIDEOGRAPHER: Okay. Can I get orders for

Page 179

I, CAROL S. NYGARD, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any witness or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name:

Dated:

CAROL S. NYGARD CSR #4018

Page 181